**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ALLEN SELBST, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **04 C 2422 (consolidated with** |
| | ) | **04 C 3635 & 04 C 3661)** |
| **McDONALD'S CORP., et al.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

Plaintiffs filed this proposed class action on behalf of shareholders who acquired stock in Defendant McDonald's Corporation ("McDonald's" or "the Company") between December 14, 2001, and January 22, 2003 ("the Class Period"). In the amended class action complaint ("the complaint"), Plaintiffs allege that McDonald's and two of its top executives[1] (collectively, "Defendants") made materially false or misleading public statements ("the Public Statements")[2] in violation of § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and the Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5.[3] The present matter comes before the court on Defendants' motion to dismiss [24-1] pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and sections §§ 78u-4 and 5 of the Private Securities Litigation Reform Act ("PSLRA"). For the reasons that follow, the Court DENIES the Defendants' motion.

---

[1]     The top McDonald's executives are Jack M. Greenberg and Matthew H. Paull, who respectively served as CEO and CFO during the relevant time period.

[2]     The Public Statements include press releases, oral statements to the media, and SEC filings, which Defendants made during the Class Period.

[3]     Plaintiffs also allege control person liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Defendants Greenberg and Paull.

# BACKGROUND[4]

This case stems from a factual situation which is very common in today's economic environment. During the Class Period, Defendants made optimistic predictions about McDonald's future economic performance and released current financial results which were in-line with Wall Street's predictions. As a result, McDonald's stock price rose up to 15% during the Class Period. Near the end of the Class Period, however, the predictions turned out to be less than prophetic and the stock price took a beating. As a result, Plaintiffs, who purchased McDonald's stock during the Class Period, brought this action alleging that Defendants: (1) knew, or had reason to believe, that the predictions of future economic growth were unattainable given McDonald's true, but undisclosed, financial condition at the time the predictions were made; and (2) manipulated McDonald's actual financial results during the Class Period to meet Wall Street's expectations.

Plaintiffs allege that Defendants concocted the above "fraudulent scheme" to inflate McDonald's stock price so that: (1) Defendant Greenberg, who was under tremendous pressure by McDonald's board, could remain as CEO; (2) individual Defendants and other high level executives could sell their McDonald's stock at an artificially inflated price; and (3) McDonald's could issue $900 million in debt at lower interest rates than if its actual financial condition had been disclosed. The Court will review the specific allegations surrounding this alleged

---

[4]      The facts in the background section are taken from the complaint and McDonald's SEC filings and press releases, which were submitted as exhibits to Defendants' motion to dismiss. The court will consider these materials despite the fact that they were not attached to the complaint as they are referred to in the complaint and are central to the Plaintiffs' claims. See Albany Bank & Trust Co. v. Exxon Mobil Corp., 310 F.3d 969, 971 (7th Cir. 2002) (the Court may also "examine documents that a defendant attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to her claim"). In addition, the Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment. Stavros v. Exelon, 2003 WL 21372468, at *8 n.8 (N.D. Ill. June 13, 2003).

fraudulent scheme but will first briefly address McDonald's business and its financial history prior to the Class Period.

**McDonald's Performance Prior to the Class Period**

McDonald's, whose principal executive offices are located in Oak Brook, Illinois, operates quick-service restaurants in over 100 countries. Through direct ownership, franchises, and joint-ventures, McDonald's restaurants number over 30,000 with revenue of approximately $40.6 billion. From the 1990's onward, McDonald's operations in the United States became increasingly constrained. As a result, its growth was primarily driven by its expansion into overseas markets. By 2000, however, McDonald's international operations were faced with decreased sales because of economic problems overseas and the threat of mad cow disease.

At the same time that its international operations went into decline, McDonald's domestic operations faced further dwindling profit margins. In response to increased competition, McDonald's was forced to dramatically slash its prices and engage in costly promotional activities. These decreasing profit margins resulted in McDonald's franchisees becoming increasingly alienated from the Company. McDonald's was also facing a dramatic decline in its customer service which caused it to lose repeat sales. In addition, McDonald's was faced with the costly task of remodeling and updating many of its domestic stores. As a result of these problems, McDonald's earnings decreased by 17% in 2001.

This decline in earnings brought increasing pressure on McDonald's CEO at that time (Defendant Greenberg). At the start of the Class Period, there were public rumors that McDonald's board would soon force Greenberg's resignation if McDonald's declining financial performance was not reversed.

**Scheme to Increase Sales and the Stock Price**

As a result of this increasing financial pressure, Defendants allegedly engaged in a fraudulent scheme whereby they: (A) repeatedly projected strong earnings growth for McDonald's without any basis for doing so; and (B) artificially inflated McDonald's reported earnings through a variety of accounting manipulations in order to meet analysts' estimates. As a result of this scheme, McDonald's share price rose by more than 15% and Greenberg remained as CEO until December of 2002.

**A.      Earnings Predictions**

Defendants allegedly issued materially false and misleading earnings projections for 2002 ("the Earnings Projections" or "the Projections"). On the first day of the Class Period, December 14, 2001, while reporting McDonald's 2001 fourth quarter earnings, Greenberg stated that "we expect 2002 earnings per share of $1.47-$1.54 . . . [which] reflects [a] 5% to 10% projected growth over 2001's estimated [] earnings."[5] Greenberg based the Projections on: (1) an increase in sales in Europe; (2) McDonald's renewed focus on quality, service, cleanliness and value; and (3) a corporate restructuring.

Defendants repeated the Earnings Projections at least five more times during the Class Period:

> *       On January 24, 2002, as McDonald's released its disappointing 2001 full-year financials, it issued a press release reiterating the Projections based on: (1) strong European sales; (2) improvements in quality, service, cleanliness and value; and (3) the addition of 1,319 restaurants in 2002.

> *       On March 22, 2002, Defendant Paull stated in a conference call with analysts that "McDonald's was still well within range of our [2002 earning] expectations." In reiterating the Projections, Paull cited sales growth in Europe and expected growth in Asia Pacific.

---

[5]      As explained below, McDonald's actual 2002 results came in at $1.33 per share.

* On April 18, 2002, in reporting that first quarter earnings were slightly ahead of the analysts' expectations, Greenberg again confirmed the Projections citing strong European sales and menu and value initiatives.

* On June 17, 2002, while pre-announcing its second quarter results, which exceeded analyst predictions, Greenberg reiterated Earnings Projections citing increased sales in Europe.

* On July 24, 2002, in reporting its actual second quarter earnings, which increased 15% compared to 2001, Greenberg stated that "[w]e expect 2002 annual earnings per share of $1.47 to $1.53," based on strong performance in Europe and increasing domestic sales.

Additionally, Plaintiffs allege that on September 17 and October 22, 2002, although McDonald's acknowledged lower earnings, it still inflated its earnings projections by stating that it expected earnings per share of $1.43 in 2002.

According to Plaintiffs, the Earnings Projections lacked a reasonable basis at all times and were thus materially false and misleading. In contradiction to the rosy Projections, Plaintiffs allege Defendants, but not the public, knew that "McDonald's domestic and international operations were suffering from a host of serious adverse factors . . . [which] were causing the Company to experience declining financial results and declining growth." In support of this contention, Plaintiffs rely on a confidential informant ("CI 1"), who was a former high-level accounting and financial reporting executive at McDonald's for more than 30 years until December 2002 (shortly before the end of the Class Period) and regularly interacted with Defendants Greenberg and Paul.

Part of CI 1's job function was to oversee financial reporting at McDonald's. According to CI 1, Defendants Greenberg and Paull were aware that "McDonald's internal forecasts [] projected declining systemwide sales growth in 2002 when compared to 2001." Regardless of this knowledge, CI 1 states that "Greenberg was only focused on meeting the

projected earnings," and that "[e]veryone knew that we couldn't meet [the Projections] of double digit growth, but [Defendants] just kept promising Wall Street that we'd have double digit growth." CI 1's information is based in part on internal Company reports which, contrary to the Public Statements, stated that McDonald's: (1) was experiencing declining sales worldwide; and (2) would have to write-off hundreds of millions of dollars in costs associated with underperforming and non-performing assets.

### B.    Inflated Earnings Reports

To make it appear that the Earnings Projections were on target, Plaintiffs allege that Defendants inflated McDonald's actual reported earnings for the first half of 2002 by failing to record or report: (1) over $170 million in costs associated with a computer system which the Company was developing to manage and streamline its operations (termed "the Innovate Project"); (2) asset impairment charges of over $402 million for hundreds of underperforming restaurants; and (3) millions of dollars in uncollectible franchise receivables.  According to Plaintiffs, by failing to incorporate the above expenses and costs into its quarterly earnings reports, McDonald's financial statements were in violation of generally accepted accounting principles and materially misleading because they overstated its earnings.

Additionally, CI 1 reports that to overcome zero growth, McDonald's "manipulated certain accounting accruals and loss reserves in an effort to manage earnings to help [the Company] meet or exceed analysts' earnings estimates." CI 1 also states that McDonald's reported millions of dollars in revenue from rent paid by South American franchisees, even though the Company never collected these rents and had agreed not to collect them.

**McDonald's Releases Its Actual 2002 Financial Results**

On December 17, 2002, shortly after Defendant Greenberg was forced to resign, McDonald's lowered its 2002 earnings prediction to $1.33 a share (compared with the initial high-end projection of $1.54) and announced that it would take $435 million in restructuring costs, some of which were in conjunction with closing underperforming restaurants.

Unfortunately for McDonald's (and its stockholders), more bad news followed on January 23, 2003, when the Company reported that for the fourth quarter of 2002, it was reporting a net loss of $343.8 million (or $.27 per share). This result was due to over $810 million in losses that McDonald's reported, including: (1) $266.9 million in restructuring costs; (2) $359.4 million for closing 719 underperforming restaurants; and (3) $183.9 million related to the termination of the Innovate Project. In response to this news, McDonald's stock price took a beating in the stock market. As a result of the decrease in McDonald's share price and the above allegations, Plaintiffs brought the instant action.

## PLEADING STANDARDS IN SECURITIES ACTIONS

Because Defendants seek to dismiss this securities fraud action under Rules 12(b)(6) and 9(b) and section 78u-4 of the PSLRA, the Court will address each of these rules and the specific pleading standards applicable to securities cases. In ruling on a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all facts alleged in the pleadings, construing allegations liberally and viewing them in the light most favorable to the non-moving party. See McMath v. City of Gary, 976 F.2d 1026, 1031 (7th Cir. 1992); Gillman v. Burlington N. R.R. Co., 878 F.2d 1020, 1022 (7th Cir. 1989). The court, however, is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that

undermine the plaintiff's claims. Scott v. O'Grady, 975 F.2d 366, 368 (7th Cir. 1992).

Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove

consistent with the pleadings would entitle the plaintiff to relief. Conley v. Gibson, 355 U.S. 41,

45-46 (1957); Kunik v. Racine County, Wis., 946 F.2d 1574, 1579 (7th Cir. 1991) (citing Hishon

v. King & Spalding, 467 U.S. 69, 73 (1984)).

     In addition to Rule 12(b)(6), because Plaintiffs claims sound in fraud, Rule 9(b) and

section 78u-4(b)(1) of the PSLRA apply. Rule 9(b) provides that "the circumstances

constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). Circumstances

constituting fraud "include the identity of the person who made the misrepresentation, the time,

place, and content of the misrepresentation, and the method by which the misrepresentation was

communicated to the plaintiff." General Elec. Capital v. Lease Resolution, 128 F.3d 1074, 1078

(7th Cir. 1997). In other words, Rule 9(b) requires a plaintiff to plead "the who, what, when,

where and how" of the fraud. DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990). In

addition, the PSLRA requires that "the complaint shall specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and if an allegation

regarding the statement or omission is made on information and belief, the complaint shall

state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).[6]

     Additionally, some of Plaintiffs' allegations are based on documents not attributable to

any one person ("group-published documents"), such as McDonald's SEC filings and press

releases. Under the "group pleading doctrine," plaintiffs may "rely on the presumption that

certain statements of a company, such as financial reports, prospectuses, registration

---

[6]     In addition, as discussed below, § 78u-4(b)(2) of the PSLRA raises the pleading
requirement for scienter.

statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company." Sutton v. Bernard, 2001 WL 897593, at *5 n.5 (N.D. Ill. Aug. 9, 2001).

Whether or not this doctrine survives the enactment of the PSLRA is unclear because the Seventh Circuit has not addressed this issue and the district courts in the Northern District of Illinois are split. Johnson, 262 F. Supp. 2d at 946-47. Until the Seventh Circuit rules otherwise, this Court will follow the majority of its sister courts in this district. The Court is thus unwilling to hold that the PSLRA abolished the group pleading doctrine. See Danis v. USN Communications, Inc., 73 F. Supp. 2d 923, 932 (N.D. Ill. 1999); Dardick v. Zimmerman, 149 F. Supp. 2d 986, 989 n.3 (N.D. Ill. 2001); Jaffe Pension Plan v. Household Int'l, Inc., 2004 WL 574665, at *17 (N.D. Ill. Mar. 22, 2004); Sutton v. Bernard, 2001 WL 897593, at 5 (N.D. Ill. Aug. 2001).[7] With these standards in mind, the Court turns to the parties' contentions.

## DISCUSSION

Defendants move to dismiss on the grounds that: (I) Plaintiffs failed to plead sufficient facts to support their allegations made on "information and belief"; (II) Plaintiffs have not alleged any misstatement or omission of material fact; (III) any alleged misstatements fall under the "safe harbor" provision of PSLRA; and (IV) the Complaint does not contain sufficient facts to meet the PSLRA's "scienter" requirement. The Court will discuss each of these contentions in turn.

First, however, the Court will briefly discuss the two counts in the Complaint and

---

[7]      Even if this Court ruled that the "group pleading doctrine" was no longer valid, any of the Earnings Projections which Plaintiffs rely on are directly attributable to Individual Defendants.

corresponding statutes which were allegedly violated by Defendants. Count I alleges that McDonald's, Greenberg, and Paull violated § 10(b) and Rule 10b-5 by making material misstatements and omissions in McDonald's SEC filings, press releases, and oral statements to the media. Count II alleges that Greenberg and Paull were "control persons" within the meaning of § 20(a) of the Exchange Act and are thus liable for McDonald's alleged misstatements and omissions of facts.

Section 10(b) prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to this section, the SEC promulgated Rule 10b-5 which makes it unlawful for any person:

> (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under section 10(b) and Rule 10b-5, the Seventh Circuit requires that a plaintiff allege that "the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 280 (7th Cir. 1996). Under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), persons who exercised control over the defendant company may be liable for misstatements and omissions made by the company. In re Neopharm, Inc. Sec. Litig., 2003 WL 262369, at *15 (N.D. Ill. Feb. 7, 2003).

## I. Allegations Made on "Information and Belief"

Defendants contend that this Court should disregard all allegations in the Complaint which are premised on "information and belief." To base their allegations on "information and belief," a plaintiff must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs attempt to satisfy this burden by asserting that their "information and belief" allegations are premised upon an investigation by counsel and based in part on confidential "internal forecasts" as well as information obtained from CI 1. The Company contends that this Court should not consider allegations derived from these sources because Plaintiffs have failed to plead sufficient facts to support the reliability of information from these two sources. Consequently, this Court will address the specific pleading standards that Plaintiffs must meet when making allegations based on confidential informants and internal company reports.

Where plaintiffs rely on "confidential sources" inside a defendant company, they need not specifically name their sources, "provided they are described in the complaint with sufficient particularity to support the probability that the source would possess the information alleged." Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000) (emphasis added). See also Johnson v. Tellabs Inc., 262 F. Supp. 2d 937, 945-46 (N.D. Ill. 2003) (adopting the pleading standard for confidential sources set forth in Novak). To require plaintiffs to name their confidential sources would "deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them." Novak, 216 F.3d at 314. See also In re Cabletron Sys., Inc., 311 F.3d 11, 30 (1st Cir. 2002) (requiring plaintiffs to name their confidential internal corporate sources would "have a chilling effect on employees who provide information about corporate malfeasance").

Applying the above standard set forth in Novak, the court in California Public Employees' Retirement System v. Chubb Corp., 394 F.3d 126, 147-48 (3d Cir. 2004), held that the plaintiffs failed to allege sufficient facts to support the "probability" that their confidential informants would possess the information alleged in the complaint. In reaching this conclusion, the Third Circuit noted that the plaintiffs did not allege the following about their informants: (1) "when" and in "what capacity" they where employed by the defendant company (i.e., what department they worked in and whether they held high-level jobs which would make them "privy" to the information in question); and (2) "when" and "how" they had "access" to the information alleged in the complaint. Id. at 148-49.

Without this information, the court held that it was not possible to gauge whether the informant had reliable "firsthand knowledge" or was simply repeating "rumors." Id. at 148, 155. Therefore, the court could not determine the reliability of the information provided by the informants. Id.; see also Taubenfeld v. Career Edu. Corp., 2005 WL 350339, at *9 (N.D. Ill. Feb 11, 2005) ("to assess the reliability" of the confidential source's information, the court must examine "the source's position [with the defendant company], the time period in which he held such a position, his access to information, and whether the allegations are based on his personal belief").

Here, Plaintiffs rely on information provided by CI 1, the confidential source who allegedly had firsthand information regarding the allegations contained in the Complaint.[8] CI 1,

---

[8]      Plaintiffs listed five confidential sources in the Complaint (CI 1 to CI 5). In their Memorandum of Law in Opposition to the Motion to Dismiss, however, Plaintiffs state that "at this time, [we] are no longer relying on CI 2, 3, 4, or 5" and are, instead, continuing to investigate the information they provided. Thus, for purposes of this motion, this Court will only consider allegations based on information from CI 1 and will not take into account those paragraphs in the Complaint which are based on information provided by CI 2 to CI 5 (e.g., ¶¶ 43, 47, 103-107, 111, 125, and 126).

according to Plaintiffs, is a "former accounting and financial reporting executive," whose primary function was to "oversee financial reporting" at McDonald's. CI 1 worked at McDonald's headquarters for more than 30 years until December 2002 (one month prior to the end of the Class Period) and "regularly interacted" with Defendants Greenberg and Paull.[9]

Under the above standard, this Court finds that Plaintiffs have pled sufficient facts to "support the probability" that CI 1 had first hand knowledge to support his (or her) statements, which are detailed below, that Greenberg and Paull "based their growth projections on 'what Wall Street wanted' and that there was no actual data that could justify the growth figures." CI 1 also asserts that Defendants Greenberg and Paull "were aware of McDonald's internal forecasts that projected declining systemwide sales growth in 2002," not increasing sales, as predicted in the Public Statements.

Defendants further assert that the above referenced "internal forecasts" lack supporting detail, and thus, should not be considered by this Court. Similar to the use of confidential informants, when basing "information and belief" allegations upon confidential internal corporate reports, Plaintiffs must specify "who authored the report, when it was authored, who reviewed the report, and what data or conclusions it was based on." Chubb, 394 F.3d at 147. Here, Defendants correctly point out that Plaintiffs have failed to meet the above standard as Plaintiffs simply cite to "internal forecasts that projected declining systemwide sales growth in 2002 when compared to 2001." (Compl. at ¶ 42.)

---

[9]    While all of these facts are not in the Complaint, the Plaintiffs assert that they could amend the Complaint to add this information if necessary. While plaintiffs generally may not amend their complaint via a response to a motion to dismiss, in the interest of time, the Court will incorporate the additional allegations regarding CI 1 into its inquiry here. Plaintiffs, however, should amend the Complaint to incorporate these additional allegations.

In response, Plaintiffs contend that this general rule is inapplicable because their allegations are not based on an actual review of the internal forecasts. Instead, they stress that CI 1, whose job was to "oversee financial reporting," allegedly saw the forecasts, along with Defendants Greenberg and Paull. They conclude that because CI 1 is a reliable source, allegations based upon his or her knowledge of these forecasts is also reliable.

This conclusion certainly pushes the envelope. The Court nevertheless finds that it is in-line with the policy considerations underlying the PSLRA. Section 78u-4(b)(1) "does not require that plaintiffs plead with particularity every single fact upon which their beliefs . . . are based." Novak, 216 F.3d at 313-14. To require Plaintiffs to have CI 1 give details of the internal forecasts could essentially "out" him or her, a result the PSLRA seeks to avoid, see id at 314, and would set the pleading standard under the PSLRA "so high that even meritorious actions [could] not survive a motion to dismiss," which would "defeat the remedial goals of the federal securities law." Sutton v. Bernard, 2001 WL 897593, at *5 (N.D. Ill. Aug. 9, 2001).

Accordingly, this Court finds that Plaintiffs have sufficiently pled particularized facts to support allegations made on "information and belief." As such, this Court will consider the allegations supplied by CI 1, including the "internal forecasts."

## II. Misstatements and Omissions of Material Facts

Defendants also contend that Plaintiffs have failed to sufficiently allege that the Public Statements constitute actionable misstatements or omissions because they were either: (A) forward-looking statements, which Defendants believed to be accurate when made; or (B) accurate historical statements. Furthermore, Defendants argue that any inaccuracies in the statements were simple "puffery" (e.g., statements of opinion) and thus not actionable. The Court will address each of these three types of statements in turn.

## A. Defendants' Earning Projections

A "forward-looking" statement is one whose truth or falsity cannot be determined until after the statement has been made. Harris v. Ivax Corp., 182 F.3d 799, 805 (11th Cir. 1999). Forward-looking statements: (1) "[contain] a projection of revenues" or other financial items; (2) "of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; (3) "of future economic performance"; and (4) "of the assumptions underlying or relating" to the aforementioned statements. 15 U.S.C. § 78u-5(i)(1). The fact that some of the statements contain language phrased in the present-tense does not convert the entire statement into a historical statement. See Harris, 182 F.3d at 807 ("when the factors underlying a projection or economic forecast include both assumptions and statements of known fact . . . the entire list of factors is treated as a forward-looking statement").

A "forward-looking statement" is actionable if it "was not made in good faith or was made without a reasonable basis." Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329, 1333 (7th Cir. 1995) (remanding to district court for a determination of whether "the forward-looking statements . . . were unreasonable in light of the facts known at the time"). Once a forward-looking statement is made, if the statement "becomes untrue" because of "subsequent events," as long as the original statement was made in good faith, the speaker does not have "a duty to update" the statement. Id. at 1332. See also Grassi v. Info. Res., Inc., 63 F.3d 596, 599 (7th Cir. 1995) ("a company has no duty to update forward-looking statements merely because changing circumstances have proven them to be wrong").

When making a forward-looking statement, however, the speaker must "speak the whole truth." Stransky, 51 F.3d at 1331. In other words, a speaker is liable if the statement contains an omission of a known material fact which makes the affirmative statement misleading or false, Kas v. Caterpillar, Inc., 815 F. Supp. 1158, 1171 (N.D. Ill. 1992), or "unreasonable." Stransky, 51 F.3d at 1335.[10] A defendant thus may be liable for issuing a future projection of earnings if the defendant "ignored facts seriously undermining the accuracy of the forecast." Good v. Zenith Elecs. Corp., 751 F. Supp. 1320, 1322 (N.D. Ill. 1990); see also In re Next Level Sys., Inc., 1999 WL 387446, at *7-8 (N.D. Ill. Mar. 31, 1999).

In assessing forward-looking statements, the court must examine them "collectively in the context in which they were made." Lindelow v. Hill, 2001 WL 830956, at *3 (N.D. Ill. July 20, 2001). In short, "disclosure required by the securities laws is measured not by the literal truth, but by the material to accurately inform rather than mislead prospective buyers." Id.; see also In re Neopharm, Inc. Sec. Lit., 2003 WL 262369, at *11 (N.D. Ill. Feb. 7, 2003).

Applying the above principles, in In re Next Level Systems, Inc., 1999 WL 387446, at *2, Judge Williams denied a motion to dismiss a securities action where the plaintiffs alleged that the defendant company made misstatements and omissions of material facts when it made a forward-looking statement to the effect that it expected its earnings to grow by 20% in the upcoming year. Judge Williams held that the plaintiffs alleged sufficient facts to show that the defendants "ignored facts seriously undermining the accuracy of [its] forecast." Id. at *7.

In reaching this conclusion, the court found that the complaint alleged that when the future prediction was made, the company knew, or should have known, that two of its three

---

[10]     Information is "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988).

business units were experiencing "serious difficulties," including the loss of a major customer. Id. By not disclosing this information, the court found that the company rendered its forecast misleading (thus not made in good faith or with a reasonable basis) and therefore could be liable under section 10(b) and Rule 10b-5. Id.

Here, Defendants allegedly made at least seven Projections which stated that in 2002, McDonald's sales would grow by 5% to 10% (as compared to 2001). This equated to earnings per share of $1.37 to $1.54. According to Plaintiffs, Defendants knew, or should have known, of facts which seriously undermined the accuracy of the Projections. By not releasing these additional facts with the Projections, Plaintiffs allege that the forward looking statements were misleading and not made in good faith or with a reasonable basis.

As explained in detail above, Defendants allegedly justified their optimistic Earnings Projections based on: (1) growth in sales from Europe; (2) improvements in "quality, service, cleanliness and value"; and (3) the opening of over 1,300 new restaurants. According to Plaintiffs, however, Defendants knew that "McDonald's domestic and international operations were suffering from a host of serious adverse factors . . . [which] were causing the Company to experience declining financial results and declining growth." Despite this information, Defendants still issued the Projections.

In support of this contention, Plaintiffs rely on CI 1, who asserts that Defendants Greenberg and Paull were aware that "McDonald's internal forecasts [] projected declining systemwide sales growth in 2002 when compared to 2001." CI 1 states that regardless of this knowledge, "Greenberg was only focused on meeting the projected earnings," and that "[e]veryone knew that we couldn't meet [the projections] of double digit growth, but [Defendants] just kept promising Wall Street that we'd have double digit growth." CI 1's

information is based in part on "internal Company reports" and first hand knowledge which allegedly revealed that contrary to the Public Statements, McDonald's: (1) was experiencing declining sales world-wide; and (2) would have to "write-off" hundreds of millions of dollars in costs associated with underperforming and non-performing assets, including a computer system McDonald's had spent hundreds of millions of dollars developing.

After carefully reviewing the Complaint and the above statements, this Court finds that Plaintiffs have pled sufficient facts to support their allegation that Defendants ignored facts that seriously undermined the accuracy of the Projections. Consequently, the Court holds that Plaintiffs have alleged sufficient facts to support their claim that the Projections were misleading and neither made in good faith nor with a reasonable basis.

### B.       Historical Statements

In addition to the Earnings Projections, Plaintiffs contend that several of McDonald's actual earnings reports are historical statements which contained actionable misstatements and omissions. In support, Plaintiffs contend that the Company, with the knowledge and consent of Greenberg and Paull, overstated its earnings by using improper accounting methods which violated GAAP.[11]

In contrast to a forward looking statement, a "historical" statement describes the

---

[11]       Under GAAP, accountants follow a "series of general principles," which are drawn from various sources including " Statements of Financial Accounting Standards" ("SFAS") published by the Financial Accounting Standards Board ("FASB"), In re Midway Games, Inc. Securities Litig., 332 F. Supp. 2d 1152, 1168 n.7. (N.D. Ill. 2004), and Statements of Position ("SOP") put out by the American Institute of Certified Public Accountants ("AICPA"). In re Spiegel, Inc. Sec. Litig., 2004 WL 1535844, at *27 (N.D. Ill. July 8, 2004). In creating GAAP, the accounting profession sought in part to "protect investors by giving them a clear and accurate picture of the position and performance of the business." Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1306 (N.D. Cal. 1996).

company's past performance – such as financial results for a prior quarter.  <u>Stransky</u>, 51 F.3d at

1331.  To allege that a historical statement violated section 10(b), the plaintiff must set forth

sufficient facts to show that "the statement [was] either false or misleading because of [] omitted

information."  <u>Kas</u>, 815 F. Supp. at 1170.  In examining historical statements, courts must

remember that "[s]ome statements, although literally accurate, can become, through their context

and manner of presentations, devices which mislead investors," and therefore, "disclosure . . . is

measured not by literal truth, but by ability of material to accurately inform rather than mislead

buyers."  <u>Id.</u> at 1171.

       Where a plaintiff alleges that historical statements were misleading because the financial

results were overstated and computed in violation of GAAP, the plaintiff must plead the GAAP

violations with sufficient particularity.  <u>See</u> <u>In re Midway Games, Inc. Securities Litig.</u>, 332 F.

Supp. 2d at 1169.  General allegations that a defendant's "accounting practices . . . resulted in a

false report of [the] company['s] earnings is not a sufficiently particular claim of

misrepresentation."  <u>Id.</u>  Instead, a plaintiff must allege: (1) the particular financial transaction

which caused the alleged misstatement of earnings; (2) the amount of the overstatement and the

effect it had on the company's earnings; (3) the applicable accounting principle(s) applied by the

company and why they were improperly applied; and (4) that the defendant was responsible for

calculating and/or disseminating the allegedly incorrect financial information.  <u>See id.</u>; <u>Clark v.

TRO Learning, Inc.</u>, 1998 WL 292382, at *2 (N.D. Ill. May 20, 1998); <u>In re K-Tel Int'l, Inc. Sec.

Litig.</u>, 107 F. Supp. 2d 994, 999 (D. Minn. 2000); 3C <u>Sec. & Fed. Corp. Law</u> § 16:89 (2d ed.

2005).

In examining alleged GAAP violations on a motion to dismiss, because accounting principles are often very complex and their application discretionary, courts should be careful not to make a factual determination as to whether the company violated a specific accounting rule, particularly where such a ruling would require the court to interpret and apply complex accounting principles.  See, e.g., Florida State Bd. of Administration v. Green Tree Fin. Corp., 270 F.3d 645, 666 (8th Cir. 2001) (reversing the district court's grant of a motion to dismiss, the appellate court held that "[u]ndoubtedly, the accounting issues are complex; whether they were handled within the parameters of good faith decision-making or whether the decisions amounted to recklessness will surely be the focus at any trial on this case"); In re Spiegel, Inc. Sec. Litig., 2004 WL 1535844, at *28 (the proper application of a specific GAAP violation is "not a proper inquiry on a motion to dismiss").  Unlike legal standards, GAAP encompass "a wide range of acceptable procedures, such that [a company] may choose to apply any of a variety of acceptable accounting procedures."  In re K-Tel Int'l, Inc. Sec. Litig., 107 F. Supp. 2d at 999.  Indeed, the proper application of GAAP in certain areas is often "unsettled," resulting in "various applications of GAAP." Clark, 1998 WL 292382, at *2 n.6.

Here, Plaintiffs allege that to meet "Wall Street's expectations," Defendants overstated McDonald's earnings in the first and second quarters of 2002 by: (1) improperly capitalizing $170 million in software development costs associated with the Innovate Project; (2) failing to "timely write down" the value of hundreds of "underperforming restaurants"; and (3) manipulating "certain accounting accruals and loss reserves."  The Court will examine each of these alleged accounting improprieties to determine if they meet the above standards.

On January 23, 2003, McDonald's announced that it was terminating the Innovate Project and would be writing off more than $170 million in research and development costs associated with the project. The Company had started the Innovate Project prior to the start of the Class Period in an attempt to create a computer system which would link all of McDonald's restaurants to a central database. Prior to January 23, 2003, McDonald's financial statements failed to disclose the existence of the costs associated with the project. Instead, these costs were recorded as assets on McDonald's balance sheets during the Class Period.

Plaintiffs contend that if McDonald's had properly followed GAAP, it would have recorded the costs associated with the Innovate Project as expenses as they were incurred instead of recording the costs as assets. According to Plaintiffs, "GAAP, in SOP 98-1 and SFAS No. 2, provides that research and development costs are to be expensed as incurred." (Am. Compl. at ¶ 92.) The Plaintiffs conclude that because McDonald's publicly admitted that "most of the $170 million [for the Innovate Project] was spent on research and development," (id. at ¶ 113), it violated GAAP and improperly overstated its earnings by $170 million by not expensing the research and development costs as they were incurred.

In response, Defendants contend that Plaintiffs have misstated the relevant GAAP provisions. According to Defendants, under SOP 98-1.21, "[i]nternal and external costs incurred to develop internal-use computers software during the application development stage should be capitalized." (Reply at 8.) Defendants thus argue that McDonald's did not violate GAAP by capitalizing the costs associated with the Innovate Project.

To clear up this dispute, the Court will look to the actual language of SOP 98-1 and SFAS No. 2. Not surprisingly, after reviewing the relevant GAAP sections, this Court finds that the rules are not as clear cut as set forth in the parties' briefs. To begin with, for purposes of

capitalizing or expensing costs associated with "internally developed software," SOP 98-1.17 divides the development of such software into two stages – the "preliminary" stage and the "application" stage.

All costs incurred in the "<u>preliminary project stage</u>" should be "expensed as they are incurred." (SOP 98-1.21) (emphasis added). Under SOP 918-1.19, " [w]hen a computer software project is in the preliminary project stage, entities will likely":

a. Make strategic decisions to allocate resources between alternative projects at a given point in time. For example, should programers develop a new payroll system or direct their efforts toward correcting existing problems in an operating system?

b. Determine the performance requirements (that is, what it is that they need the software to do) and systems requirements for the computer software project it has proposed to undertake.

c. Invite vendors to perform demonstrations of how their software will fulfill an entity's needs.

d. Explore alternative means of achieving specific performance requirements. For example, should an entity make or buy the software? Should the software run on a mainframe or a client server system?

e. Determine that the technology needed to achieve performance requirements exists.

f. Select a vendor if an entity chooses to obtain software.

g. Select a consultant to assist in the development or installation of the software.

(SOP 98-1.19.)

Additionally, under SOP 98-1.18, "[t]he following . . . <u>research and development</u> [costs] should be accounted for in accordance with the provisions of FASB Statement No. 2":

a. Purchased or leased computer software used in research and development activities where the software does not have alternative future uses.

b.       All internally developed internal-use software (including software developed by third parties, for example, programmer consultants) if: (1) the software is a pilot project . . . or (2) the software is used in a particular research and development project, regardless of whether the software has alternative future uses.

(SOP 98-1.18.) Under FASB Statement No. 2, ¶ 12, "[a]ll research and development costs . . . shall be charged to expense when incurred." (emphasis added.)

In contrast, "costs incurred to develop internal-use computer software during the application development stage should be capitalized." (SOP 98-1.21) (emphasis added). The application development stage includes the following "stages":

*       Design of chosen path, including software configuration and software interfaces;

*       Coding;

*       Installation to hardware; and

*       Testing; including parallel processing phase.

(SOP 98-1.17.)

Costs may be capitalized, however, only after "both of the following occur":

a.       Preliminary project stage is complete.

b.       Management . . . implicitly or explicitly authorizes and commits to funding a computer software project and it is probable that the project will be completed and the software will be used to perform the function intended.

(SOP 98-1.27.)

After reviewing the above accounting standards and the relevant allegations in the Complaint, this Court finds that Plaintiffs have alleged sufficient facts to support a claim that McDonald's did not follow the proper accounting standards in expensing costs associated with the Innovate Project. In reaching this holding, the Court acknowledges that the Complaint

contains scant detail as to the specific stages of progress for the Innovate Project.[12]

Nevertheless, given the complex and ambiguous nature of the above accounting standards, at this stage in the case, it would be improper for the Court to determine that the costs for the Innovate Project were properly accounted for in McDonald's financial statements. Moreover, because Plaintiffs have alleged that McDonald's publicly admitted that "most of the $170 million [for the Innovate Project] was spent on research and development," under FASB Statement No. 2, ¶ 12, it appears that Plaintiffs have properly alleged a GAAP violation. Therefore, at this time, this Court holds that Plaintiffs have sufficiently pled that: (1) under GAAP, Defendants should have expensed costs associated with research and development for Project Innovate; and (2) by not doing so, McDonald's first and second quarter 2002 earnings statements were overstated by as much as $170 million.

In addition, Plaintiffs allege that Defendants overstated McDonald's earnings when, contrary to GAAP, they failed to "timely write down" the value of hundreds of McDonald's "underperforming restaurants." As a result of this delay, on January 23, 2003, McDonald's was forced to take a one-time charge of $402 million associated with the closing of 719 underperforming restaurants. This one time charge allegedly resulted in a significant drop in McDonald's share price.

In support of their contention that Defendants impermissibly delayed writing off these

---

[12]     In holding that Plaintiffs have not provided details as to the progress of the stages of the Innovate Project, the Court notes that the allegations regarding the specifics of the project are based on information supplied by CI 4. As explained above, however, Plaintiffs have withdrawn allegations stemming from CI 4. Therefore, the Court will not consider these allegations.

closures for more than a year, Plaintiffs point to the following GAAP rules – SFAS No. 5, ¶ 8 and No. 144.  Under SFAS No. 5, ¶ 8, "losses shall be accrued by a charge to income if: (i) information indicates that it is possible that an asset had been impaired . . . at the date of the financial statements; and (ii) the amount of loss can be reasonably estimated."  In turn , under SFAS No. 144, "long-lived assets" should be tested for "impairment" if any of the following "events of changes in circumstances" are present:

(a) "a significant decrease in the market price";

(b) "a significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition";

(c) "a significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset";

(d) "an accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset";

(e) "a current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of the long-lived asset"; or

(f) "a current expectation that more likely than not . . . a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated life."

If any of the above conditions apply, GAAP requires that the long-lived asset be tested for impairment.  In testing a long-lived asset for impairment,  SFAS No. 144 requires that "long-lived assets are to be grouped with other assets and liabilities at the lowest level of largely independent, identifiable cash flows."

Here, Defendants annually tested McDonald's long-lived assets, but allegedly violated SFAS No. 144 by not grouping McDonald's long-lived assets (e.g., its restaurants) "at the lowest level of largely independent, identifiable cash flows."  According to Plaintiffs, Defendants tested "its U.S. [restaurants] on a television market basis and its international [restaurants] on a

country-wide basis." Under this grouping, Defendants, allegedly in violation of SFAS No. 144, ended up grouping McDonald's "better performing restaurants with those performing poorly." As a result, Defendants were "able to improperly delay the recognition of its impaired assets during the Class Period."

Plaintiffs allege that if Defendants had conducted a proper "impairment analysis" (e.g., if they had grouped assets with similar cash flows) at the beginning of the Class Period, it would have shown that the $402 million impairment charge should have been taken at that time. According to Plaintiffs, the following factors indicate that hundreds of McDonald's restaurants were "significantly impaired" at the start of the Class Period:

* The Company's Latin American market was plagued by severe and persistent economic difficulties as Argentina, Brazil and Venezuela were mired in a deepening recession and had been for some time.

* Argentina broke convertibility – the link between the Argentine Peso and the U.S. dollar – in January 2002, thereby causing a dramatic decline in the value of Argentine investments. Argentina was the 'flagship' for the Company's Latin American operations. The dramatic decline in asset values in Argentina extended to other Latin American markets.

* The European markets were also mired in a recession and the Company's sales were still being negatively impacted by the Mad Cow scare which had caused beef consumption in that region to decrease dramatically if not completely.

* The Company's Japanese operations were being negatively affected by the Mad Cow scare and Severe Acute Respiratory Syndrome.

* The Company's U.S. operations were plagued by inadequate customer service [and] many of the stores were in disrepair and required substantial capital improvement.

Based on these facts, Plaintiffs contend that if Defendants had followed the proper GAAP asset testing procedures, they would have expensed the $402 million impairment charge at the beginning of the Class Period. By not doing so, the Plaintiffs contend that Defendants

artificially inflated the price of McDonald's share price, resulting in Plaintiffs overpaying when they purchased McDonald's stock during the Class Period.

In response, Defendants contend that Plaintiffs have failed to put forth sufficient facts to allege that a different impairment analysis "would have shown that hundreds of unidentified restaurants were impaired." While this may or may not be true, at this point in the litigation, before discovery, it would be impossible for Plaintiffs to have access to such detailed facts or for this Court to make such a determination on a motion to dismiss. The Court thus concludes that Plaintiffs have sufficiently alleged that Defendants failed to follow the proper procedures for testing McDonald's long-lived assets. By not doing so, McDonald's first and second quarter 2002 earnings statements were allegedly overstated by at least $402 million. Accordingly, the Court finds that Plaintiffs have set forth sufficient facts to plead an actionable omission with respect to Defendants' failure to expense the above impairment charge.

Plaintiffs' final GAAP allegation is that Defendants improperly manipulated certain accounting accruals and loss reserves. According to CI 1, "[w]hen you have zero growth but you're generating seven or eight cents per share, you have to be doing something to come up with that number." Plaintiffs assert that to meet the Projections and Wall Street's expectations, Defendants improperly: (1) "controll[ed] the timing of store sales"; (2) converted insurance reserves into revenue; and (3) recorded millions of dollars in uncollectible lease payments from Brazilian franchisees as revenue. With respect to the Brazilian lease payments, CI 1 contends that as economic conditions continued to deteriorate during 2002, McDonald's verbally agreed not to collect millions of dollars in lease payments from its Brazilian franchisee. Defendants, however, continued to account for these payments as "receivables," although they knew that the

payments would never be collected.  As a result, Plaintiffs assert that Defendants violated GAAP revenue recognition principles and overstated McDonald's revenue for the first half of 2002.

Although Plaintiffs do not provide particularly specific details regarding the Brazilian lease scheme, the Court finds that they have sufficiently pled that by recording the uncollectible payments as revenue, Defendants violated GAAP revenue recognition principles and overstated McDonald's revenue by over $14 million in the first half of 2002.   Accordingly, the Court finds that Plaintiffs have set forth sufficient facts to plead an actionable omission with respect to the Brazilian lease scheme.[13]

In conclusion, this Court holds that Plaintiffs have alleged sufficient facts surrounding Defendants' GAAP violations to allege actionable misstatements and/or omissions.

### C.      Puffery

Defendants also contend that "many of the purported misleading statements alleged in the Complaint constitute general statements of corporate optimism and opinion about the Company's business and prospects," and are therefore non-actionable.  In support of this contention, Defendants cite to one-sentence statements in three of the Public Statements.  The problem with this contention is that even if these statements are "mere puffery," they are within larger statements which contain both forward-looking and historical statements.  Thus, examining the statements "collectively in the context in which they were made," Lindelow, 2001 WL 830956, at *3, this Court finds that even if the Public Statements contain some general opinions, they are nevertheless actionable.

---

[13]      As for Plaintiffs' other two allegations – the improper timing of store sales and converting reserves into revenue – the Court holds that Plaintiffs have failed to allege sufficient details to properly allege an actionable misstatement or omission regarding these claims.

**III.     Safe Harbor Provision of the PSLRA**

Defendants also move to dismiss the Complaint on the grounds that the Public

Statements fall under the safe harbor provision of the PSLRA.  The safe harbor provision, 15

U.S.C. § 78u-5(c)(1), contains "two independent prongs" – subsections (A) and (B).  <u>Southland</u>

<u>Sec. Corp. v. Inspire Ins. Solutions, Inc.</u>, 365 F.3d 353, 371 (5th Cir. 2004); <u>see also</u> Joint

Explanatory Statement of the Committee of Conference, Statement of Managers, H.R. Conf.

Rep. No. 104-369, 104th Cong., at 44, 1995 U.S.S.A.N. 730, 743.  Under this section, both

written and oral statements are protected "if and to the extent that – "

> (A) the forward-looking statement is – (i) identified as a forward-looking statement, and is accompanied by <u>meaningful cautionary statements</u> identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . or

> (B) the plaintiff fails to prove that the forward looking statement . . . was <u>made with actual knowledge . . . that the statement was false or misleading.</u>

15 U.S.C. § 78u-5(c)(1) (emphasis added).  Defendants contend that the Public Statements are

protected under both prongs of the safe harbor rule in that: (A) they were forward looking

statements which contained "meaningful cautionary language"; and (B) Plaintiffs have failed to

plead sufficient facts to show that Defendants had "actual knowledge that the statement[s] [were]

false or misleading." The Court will address each of these contentions in turn.[14]

**A.     The First Prong of the Safe Harbor Provision**

Exactly what constitutes "meaningful cautionary language" is "difficult if not

impossible" to decipher, particularly "at the pleading stage, before plaintiffs have access to

discovery."  <u>Asher v. Baxter Int'l Inc.</u>, 377 F.3d 727, 729, 734 (7th Cir. 2004).  For example, in

---

[14]     The Court notes that regardless of its decision as to the application of the safe harbor rule, only forward-looking statements are protected.  Thus, the historical statements, which are detailed above, do not qualify for safe harbor protection.

<u>Asher</u>, the plaintiffs/shareholders alleged that the defendant made misleading forward-looking

statements predicting revenue growth in the "low teens."[15] <u>Id.</u> at 728. These optimistic

predictions were allegedly false because: (1) the defendant's "Renal Division had not met its

internal budgets in years"; (2) economic instability in Latin America resulted in a drop in sales in

that region; (3) the defendant was forced to close faulty plants which provided "its principal

source of low-cost" dialysis products; and (4) a supply glut in certain products led to lower

prices and revenues. <u>Id.</u> at 728-29.

On a motion to dismiss, the defendant contended that the following "cautionary

statements" included with the company's forward-looking statements were "meaningful" under

the safe harbor rule:

> Statements throughout this report that are not historical facts are forward-looking
> statements. These statements are based on the company's current expectations
> and involve numerous risks and uncertainties. Some of these risks and
> uncertainties are factors that affect all international businesses, while some are
> specific to the company and the health care arenas in which it operates.
>
> Many factors could affect the company's actual results, causing results to differ
> materially, from those expressed in any such forward looking statements. These
> factors include, but are not limited to, interest rates; technological advances in the
> medical field; economic conditions; demand and market acceptance risks for new
> and existing products, technologies and health care services; the impact of
> competitive products and pricing; manufacturing capacity; new plant start-ups;
> global regulatory, trade and tax policies; regulatory, legal or other developments
> relating to the company's Series A, AF, and AX dialyzers; continued price
> competition; product development risks, including technological difficulties;
> ability to enforce patents; actions of regulatory bodies and other government
> authorities; reimbursement policies of government agencies; commercialization
> factors; results of product testing; and other factors described elsewhere in this
> report or in the company's other filings with the Securities and Exchange
> Commission. Additionally, as discussed in Item 3 – "Legal Proceedings," upon

---

[15]     The defendant company in <u>Asher</u> was a diversified multinational health care company
with the three principal divisions: (1) the "Medication Delivery Division"; (2) the "BioScience
Division"; and (3) the "Renal Division," whose principal source of revenue was dialysis
machines and products. <u>Id.</u>

the resolution of certain legal matters, the company may incur charges in excess of presently established reserves. Any such change could have material adverse effect on the company's results of operations or cash flows in the period in which it is recorded.

Currency fluctuations are also a significant variable for global companies, especially fluctuations in currencies where hedging opportunities are unreasonably expensive or unavailable. If the United States dollar strengthens significantly against most foreign currencies, the company's ability to realize projected growth rates in its sales and net earnings outside the United States could be negatively impacted.

The company believes that its expectations with respect to forward-looking statements are based upon reasonable assumptions within the bounds of its knowledge of its business operations, but there can be no assurance that the actual results or performance of the company will conform to any future results or performance express or implied by such forward-looking statements.

Id. at 729-30.

The district court granted the defendant's motion to dismiss, stating that the defendant's language was "meaningful" in that it identified "important factors that could [and did] cause actual results to differ materially from those in the forward-looking statements." Id. at 730. The Seventh Circuit reversed. The court acknowledged that the defendant's cautionary statement was not boilerplate because it "included [company]-specific information and highlighted some parts of the business that might cause problems." Id. at 733. However, the court stated that "there is no reason to think – at least, no reason that a court can accept at the pleading stage, before discovery – that the items mentioned in [the] cautionary language were those that at the time were the (or any of the) 'important' sources of variance." Id. at 734.

In other words, according to the Seventh Circuit, the district court erred because at the motion to dismiss stage, it was impossible to determine if the potential "sources of variance" mentioned in the cautionary language were the "major risks [the company] faced when it made its forecasts." Id. In remanding to the district court, the Seventh Circuit noted that, "we cannot

exclude the possibility that if after discovery [the company] establishes that the cautions did reveal what were, *ex ante*, the major risks, the safe harbor may yet carry the day." Id.

Here, the Public Statements contain the following warnings:

Certain forward-looking statements are included in this release. They use such words as may, will, expect, believe, plan, and other similar terminology. These statements reflect management's current expectations regarding future events and operating performance and speak only as of the date of this release. These forward-looking statements involve a number of risks and uncertainties. The following are some of the factors that could cause actual results to differ materially from those expressed in or underlying our forward-looking statements: the effectiveness of operating initiatives and advertising and promotional efforts, as well as changes in: global and local business and economic conditions; currency exchange and interest rates; food, labor and other operating costs; political or economic instability in local markets; competition; consumer preferences, spending patterns and demographic trends; legislation and governmental regulations; and accounting policies and practices. The foregoing list of important factors is not exclusive.

The Court finds that there are a number of problems with these warnings. First, they appear to be general and not specifically tailored to the Projections. Because "vague and boilerplate" cautionary statements are not sufficient, the above statements do not bring the Projections within the first prong of the safe harbor rule. See Asher, 377 F.3d at 730 (to be meaningful, the cautionary language must at least "reveal[] the principal risks" facing the company at the time the forward-looking statements were issued); Lindelow, 2001 WL 830956, at *4 ("[t]o be effective, the cautionary language 'must be substantive and tailored to the specific future projections, estimates or opinions'" contained in the alleged misleading forward-looking statement); In re Next Level Sys., Inc., 1999 WL 387446, at *8 n.4 ("vague or boilerplate disclaimers . . . will not suffice; instead, the cautionary language must be substantive and tailored to the specific future projections, estimates or opinions that are alleged to be misleading").

Also, even if this Court were to find that the above warnings were not boilerplate, at this time the Court cannot determine if the potential "sources of variance" mentioned in the cautionary language were the "major risks [the company] faced when it made its forecasts." See Asher, 377 F.3d at 734. Plaintiffs contend that Defendants knew, or should have known, that the Projections were unattainable because Defendants knew that McDonald's: (1) "internal forecasts [] projected declining systemwide sales growth in 2002 when compared to 2001"; (2) was experiencing declining sales world-wide; and (3) would have to "write-off" hundreds of millions of dollars in costs associated with underperforming and non-performing assets. At the end of the Class Period McDonald's announced over $810 million in losses, including: (1) $266.9 million in restructuring costs; (2) $359.4 million for closing 719 underperforming restaurants; and (3) $183.9 million related to the termination of the Innovate Project. Because McDonald's cautionary statements do not mention or refer to the above variances, the Court cannot hold at this time that the above warnings were the "objective risks" which McDonald's faced when making the Projections and which caused McDonald's later financial problems. Accordingly, this Court finds that the first prong of the safe harbor rule is inapplicable.[16]

### B.    The Second Prong of the Safe Harbor Provision

Defendants also contend that the second prong of the safe harbor rule covers the Public Statements because Plaintiffs have failed to plead sufficient facts to show that Defendants had "actual knowledge that the statement[s] [were] false or misleading." Under the safe harbor rule's second prong, both written and oral statements are protected "if and to the extent that –(B)

---

[16]    The Court notes that this ruling does not preclude Defendants from raising the first prong of the safe harbor on a motion for summary judgment. As the Seventh Circuit noted in Asher, 377 F.3d at 734, this Court "cannot exclude the possibility that if after discovery [Defendants] establish[] that the cautions did reveal what were, *ex ante*, the major risks, the safe harbor may yet carry the day."

the plaintiff fails to prove that the forward looking statement . . . was <u>made with actual</u> <u>knowledge . . . that the statement was false or misleading</u>. 15 U.S.C. § 78u-5(c)(1) (emphasis added).  Courts interpret this language as "protect[ing] forward looking statements if . . . [they] were made without actual knowledge that the statements were false or misleading." <u>In re</u> <u>Lockheed Martain Corp. Sec. Litig.</u>, 272 F. Supp. 2d 944, 949 (C.D. Cal. 2003).  <u>But see</u> <u>In re</u> <u>AOL Time Warner, Inc. Sec. and ERISA  Litig.</u>, 2004 WL 992991, at *19 (S.D.N.Y. May 5, 2004) (refusing to apply the second part of the safe harbor where the plaintiff "has adequately alleged that [the public statements] were made with conscious or <u>reckless disregard</u> for the true financial condition of the company") (emphasis added).

Although the language of the second prong requires the plaintiff "to prove," which this Court construes as proving at trial, courts interpreting this provision hold that plaintiffs must allege sufficient facts "to raise a reasonable and strong inference that defendants" had "actual knowledge" of the "false or misleading nature" of the forward-looking statements.  <u>See</u> <u>In re</u> <u>Compuware Sec. Litig.</u>, 301 F. Supp. 2d 672, 682 (E.D. Mich. 2004); <u>see also</u> <u>In re Seebeyond</u> <u>Tech. Corp. Sec. Litig.</u>, 266 F. Supp. 2d 1150, 1163 (C.D. Cal. 2003) (denying a motion to dismiss where plaintiff "made sufficient allegations that the defendants had actual knowledge that the statements in the [] press release were false or misleading"); <u>State of New Jersey v.</u> <u>Sprint</u>, 2004 WL 1960130, at *9 (D. Kan. Sept. 3, 2004) (holding that plaintiffs "properly pled a claim based on [misleading forward-looking] statements" because they were "alleged to have been  made with actual knowledge that they were false or misleading"); <u>In re Globalstar Sec.</u> <u>Litig.</u>, 2003 WL 22953163, at *8 (S.D.N.Y. Dec. 15, 2003) (denying a motion to dismiss "[b]ecause plaintiffs sufficiently allege[d] that defendants knew their misrepresentations were false when made"); <u>Clark v. TRO Learning, Inc.</u>, 1998 WL 292382, at *5 (N.D. Ill. May 20,

1998) (dismissing action under the second prong of the safe harbor because the plaintiff "fail[ed] to allege in the complaint that defendants had actual knowledge of falsity"); 3 Bromberg & Lowenfels, <u>Securities Fraud & Commodities Fraud</u> § 6:36, at 6-109 (2d ed. 2004) (plaintiff must allege that defendant had "actual knowledge" that the public statements were misleading).

To meet this pleading standard, plaintiffs must do more than simply allege that the defendants had "actual knowledge" that the forward-looking statement was false or misleading. <u>Asher v. Baxter Int'l, Inc.</u>, 2005 WL 331572, at *5 (N.D. Ill. Feb. 3, 2005); <u>Sprint</u>, 2004 WL 1960130, at *9-10. Instead, under 15 U.S.C. § 74u-4(b) and Rule 9(b), a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant" had "actual knowledge of the falsity of the statements." <u>In re Noven Pharm., Inc. Sec. Litig.</u>, 238 F. Supp. 2d 1315, 1322-23 (S.D. Fla. 2002). In determining whether plaintiffs have met this burden, courts examine the totality of the facts, <u>see</u> <u>In re Kinderd Health care, Inc. Sec. Litig.</u>, 299 F. Supp. 2d 724, 740 (W.D. Ky. 2004), including, whether the defendants: (1) "were in possession of specific information which called into doubt their stated projections," <u>In re Globalstar Sec. Litig.</u>, 2003 WL 22953163, at *7 ; (2) had "motive and opportunity" to issue the misleading statements, <u>In re Compuware Sec. Litig.</u>, 301 F. Supp. 2d at 688; (3) sold the company's stock "at a suspicious time or in an unusual amount," <u>In re Kinderd Health care, Inc. Sec. Litig.</u>, 299 F. Supp. 2d at 739-40; and (4) had "access to financial data through sophisticated information technology." <u>Id.</u>

Additionally, "high-level [] managers . . . may be presumed to have been aware of [] problems" at their company. <u>Danis v. USN Communications, Inc.</u>, 73 F. Supp. 2d 923, 938 (N.D. Ill. 1999) (addressing whether a plaintiff sufficiently alleged knowledge of misleading statements but not interpreting the second prong of the safe harbor). Such a presumption is

particularly strong where the specific problem facing the company: (1) affects "a significant source of income" or a "core [business] operation"; or (2) would be "readily recognized by an outsider." Id. at 939.

Following the above standards, courts have found that plaintiffs have sufficiently alleged actual knowledge where the complaint contains allegations that defendants were high level managers who had access to reports which would lead a reasonable person to believe that the predictions being made in public statements are not accurate and/or missing relevant information. For example, in Globalstar Sec. Litig., 2003 WL 22953163, at *1, the plaintiff shareholders alleged that the individual defendants, who were the company's top officers and managers, "artificially inflated the value of [the company's] stock by making material misstatements and omissions regarding the company's financial prospects" in statements released to the public. The defendant company was in the business of providing satellite phone service. Id. at *2. At the beginning of the class period, the defendants issued a press release announcing "projections" of $300 million in revenue and 600,000 paying customers by the end of the following year. Id. The defendants reiterated these statements several times over the next year. Id. at *2-3. At the end of the year, however, the company announced that it had only 21,300 subscribers and revenues no where near those projected. Id. *4.

The plaintiffs alleged that the defendants "knew" that their projections were misleading because they were based on an assumption that all 38 of the company's satellites would be operating, when in fact the defendants knew that only three were running and the others were "plagued with numerous delays." Id. at *6. According to the plaintiffs, the defendants were "updated on a weekly basis" on these problems and the lack of subscribers. Id. at *7. Nevertheless, the defendants continued to make the unrealistic projections. Id. Based on these

allegations, the court, in denying a motion to dismiss, held that "[b]ecause plaintiffs have sufficiently allege[d] that defendants knew their [projections] were false when made, the safe harbor" was not applicable. Id. at *9.

Similarly, in Compuware Sec. Litig., 301 F. Supp. 2d at 677, the plaintiff shareholders alleged that the individual defendants, who were the company's top officers and managers, "issued a series of misleading [public] statements designed to conceal from the investing public the serious problems which developed" in the defendant company's "business relationship" with IBM. The defendant company was a computer software company whose "majority of [] revenue . . . [was] dependent upon" its customers' ability to run the defendant's software on IBM mainframe computers. Id. At the beginning of the class period, the defendants learned that IBM was planning on developing its own software to compete with the defendant and that IBM would no longer give the defendant access to vital technical information. Id. at 677-78. Despite knowing this adverse information, the plaintiffs alleged that the defendants failed to disclose this news in their press releases and public filings. Id. at 678. Instead, the defendants issued unattainable positive predictions projecting future sales growth and improved profitability. Id. at 678-79.

In ruling on a motion to dismiss, the court found that the plaintiffs had pled sufficient facts to "rais[e] a reasonable and strong inference" that the defendants had "actual knowledge" that the public statements were false or misleading, and thus, the second prong was not applicable. Id. at 683. The court made this decision based on all of the alleged facts, including that IBM informed the defendants that it was dissatisfied with its software and was planning on developing a competing product. Id. at 685. Given the importance of this line of business to the

defendant company's overall sales, the court noted that its was unreasonable for top management to state that the company's prospects looked promising.  Id.

Likewise, in Sprint, 2004 WL 1960130, at *9-10, the court found that the plaintiff shareholders had alleged sufficient facts to meet the second prong of the safe harbor.  The shareholders alleged that the defendant company issued false and misleading statements stating that two key executives, who had "transformed" the defendant from "a rural phone company to a national carrier," would continue to lead the company.  Id. at *3.  In fact, however, the two key executives were facing serious financial problems as the result of misusing a tax shelter.  Id.  These problems were so serious that "it was inevitable, or at a minimum, a material possibility, that the [two executives] would no longer serve" the defendant.  Id. at *4.

The defendants moved to dismiss on the grounds that the "allegations of actual knowledge [were] conclusory and thus, insufficient to withstand a motion to dismiss." Id. at *10. Rejecting this contention, the court held that the plaintiffs alleged that it was known in the company that the two executives faced serious financial problems in the form of tax liabilities, which would probably bankrupt them.  Id.  Thus, the court found that, particularly "before discovery," these allegations raised a real possibility that the two executives would not be employed in the future, and therefore, "actual knowledge" was properly alleged.  Id.

Here, after carefully reviewing the aggregate of the conduct alleged in the Complaint, the Court finds that Plaintiffs have pled sufficient facts to raise a reasonable and strong inference that Defendants had "actual knowledge" that the Public Statements were misleading.  For example, according to CI 1, Defendants Greenberg and Paull (who were McDonald's CEO and CFO at that time) were aware that, contrary to the Projections, "McDonald's internal forecasts [] projected declining systemwide sales growth in 2002 when compared to 2001."  Regardless of

this knowledge, CI 1 states that "Greenberg was only focused on meeting the projected earnings," and that "[e]veryone knew that we couldn't meet [the projections] of double digit growth, but [Defendants] just kept promising Wall Street that we'd have double digit growth."

CI 1's information is buttressed by internal Company reports which, contrary to the Public Statements, stated that McDonald's: (1) was experiencing declining sales world-wide; and (2) would have to write-off hundreds of millions of dollars in costs associated with underperforming and non-performing assets. Additionally, as detailed below, Plaintiffs allege that Defendants had "motive and opportunity" to issue the misleading statements because: (1) at the start of the Class Period, there were public rumors that the board "would soon force Greenberg's resignation if McDonald's declining financial performance was not reversed"; and (2) McDonald's needed an additional $900 million in loans at a lower interest rate than if its "true" financial condition were disclosed.

Accordingly, based on the totality of the allegations, this Court finds that Plaintiffs have pled sufficient facts to raise a reasonable and strong inference that Defendants had "actual knowledge" that the Public Statements were misleading.[17]

## IV.     Scienter

The PSLRA requires that a claim for securities fraud "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint must state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

---

[17]     In reaching this holding, the Court notes that although the PSLRA substantially raised the pleading standard in securities cases, "courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities law." Sutton v. Bernard, 2001 WL 897593 at *5 (N.D. Ill. Aug. 9, 2001).

4(b)(1).  See Law v. Medco Research, Inc., 113 F.3d 781, 785 (7th Cir. 1997); Rehm v. Eagle

Finance Corp., 954 F. Supp. 1246, 1251 (N.D. Ill. 1997).  The PSLRA also requires plaintiffs to

"state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind." 15 U.S.C. § 78u-4(b)(2).

    The Defendants assert that Plaintiffs have not alleged sufficient facts to plead

scienter under the PSLRA.   Scienter is a "mental state embracing an intent to deceive,

manipulate, or defraud." See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12 (1976).

"While the PSLRA does not contain a specific scienter requirement for § 10(b) fraud claims, it is

generally recognized that the appropriate standard for alleging scienter under the PSLRA is the

Second Circuit standard which requires a plaintiff to allege facts that give rise to a strong

inference of fraudulent intent."  In re Merchants Acceptance Corp. Sec. Litig., 97 C 2715, 1998

WL 781118 at *7 (N.D. Ill. Nov. 4, 1998).[18]  The Second Circuit's pleading standard for scienter

may be established by alleging facts that: (1) "constitute strong circumstantial evidence of

conscious misbehavior or recklessness"; or (2) "show that defendants had both motive and

opportunity to commit fraud."  See Rehm, 954 F. Supp. at 1253.  Here, Defendants contend that

Plaintiffs have failed to meet either one of these prongs.  As such, the Court will address both

tests.

    "Reckless conduct is, at the least, conduct which is highly unreasonable and which

represents an extreme departure from the standards of ordinary care . . . to the extent that the

_____

[18]     While the Seventh Circuit has yet to address the pleading standard espoused by the
Second Circuit, most of the courts in this district  have followed the Second Circuit's standard.
See, e.g., Danis v. USN Communic., Inc.,1999 WL 967545 at *11-12 (N.D. Ill. Oct. 8, 1999); In
re Spyglass, Inc., Securities Litigation, 1999 WL 543197 at *7 (N.D. Ill. July 21, 1999); In re
Next Level Systs., Inc.,1999 WL 387446 at *9 (N.D. Ill. March 31, 1999); In re First Merchants
Acceptance Corp. Sec. Litig., 1998 WL 781118 at *7 (N.D. Ill. Nov. 4, 1998).

danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 1255. In pleading circumstantial facts of recklessness, the PSLRA's pleading requirement is met "as long as the overall facts give rise to a strong inference that the defendant acted recklessly." Chu v. Sabratek Corp., 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000).

In determining whether conduct was reckless, "the more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial discrepancy." Rehm, 954 F. Supp. at 1255. "High-level [] managers . . . may be presumed to have been aware of [] problems" at their company. Danis, 73 F. Supp. 2d at 938 (N.D. Ill. 1999). Such a presumption is particularly strong where the specific problem facing the company: (1) affects "a significant source of income" or a "core [business] operation"; or (2) would be "readily recognized by an outsider." Id. at 939. Also, although not enough when standing alone, violations of GAAP "may buttress other facts supporting a finding of scienter." Id. at 940; accord In re First Merchants Acceptance Corp. Sec. Litig., 1998 WL 781118, at *10 (N.D. Ill. Nov. 4, 1998).

Here, after carefully reviewing the Complaint, this Court finds that Plaintiffs have sufficiently alleged facts that raise a reasonable and strong inference that Defendants had "actual knowledge" of non-public information which contradicted the Public Statements and/or suggested that they were inaccurate or misleading. Such allegations constitute "classic evidence of scienter." In re Neopharm, Inc. Sec. Litig., 2003 WL 262369 at *14 (N.D. Ill. Fed. 7, 2003) (finding the scienter recklessness requirement met where plaintiffs alleged that public statements were made while defendants were "in possession of non-public information that directly contradicted [these] statements"); see also In re Sensormatic Electronics Corp. Sec. Litig., 2002 WL 1352427 at *6 (S.D. Fla. June 10, 2002) ("where defendant publishes a statement at a time

he is in possession of or has access to facts suggesting that the statement is inaccurate, misleading, or incomplete . . . is . . . a classic fact pattern giving rise to a strong inference of scienter").

As explained in detail above, according to CI 1, Defendants Greenberg and Paull (McDonald's CEO and CFO, respectively) were aware that "McDonald's internal forecasts [] projected declining systemwide sales growth in 2002 when compared to 2001." Regardless of this knowledge, CI 1 states that "Greenberg was only focused on meeting the projected earnings," and that "[e]veryone knew that we couldn't meet [the projections] of double digit growth, but [Defendants] just kept promising Wall Street that we'd have double digit growth." CI 1's information is buttressed by "internal Company reports" which, contrary to the Public Statements, stated that McDonald's: (1) was experiencing declining sales world-wide; and (2) would have to write-off hundreds of millions of dollars in costs associated with underperforming and non-performing assets. These allegations, combined with the allegations detailed above to the effect that Defendants violated GAAP in preparing McDonald's financial statements "support a strong inference of scienter." Marksman Partners, L.P., 927 F. Supp. at 1313. Accordingly, this Court holds that Plaintiffs have alleged sufficient facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.

The court also notes that Plaintiffs have attempted to plead scienter by alleging facts to "show that defendants had both motive and opportunity to commit fraud." According to Plaintiffs, Defendants had "motive and opportunity" to issue the misleading statements because: (1) at the start of the Class Period, there were public rumors that the board "would soon force Greenberg's resignation if McDonald's declining financial performance was not reversed";

(2) Individual Defendants and other high level executives could sell their holdings of McDonald's stock at the artificially inflated price; and (3) McDonald's needed an additional $900 million in loans at a lower interest rate than if its "true" financial condition were disclosed.

There are a number of problems with Plaintiff's "motive and opportunity" argument. First, taken alone, allegations that a company issued fraudulent statements to maximize "corporate debt . . . do not even remotely suggest fraudulent motivation." Starvos v. Excelon Corp., 266 F. Supp. 2d 833, 848 (N.D. Ill. 2003). Likewise, general allegations that defendants engaged in fraud to "retain their [corporate] positions" are not sufficient to allege motivation. Chu, 100 F. Supp. at 841. Accordingly, these two allegations by themselves are not sufficient to allege motivation.

With respect to the insider stock sales, "[t]he mere fact that a company's executives sold stock during the class period is not enough." Id. Instead, to allege motivation and opportunity adequately, a plaintiff must allege facts showing that "the sale[s] [were] dramatically out of line with prior trading practices and that the sale was timed to maximize personal benefit from undisclosed inside information." Id. Here, Plaintiffs simply allege that Defendants Greenberg and Paull sold stock during the Class Period. This is not sufficient in and of itself to show motivation.

Accordingly, although Plaintiffs have not alleged sufficient facts to show opportunity and motivation, they have sufficiently alleged strong circumstantial evidence of conscious misbehavior or recklessness. Thus, they have sufficiently alleged scienter.

## CONCLUSION

For the reasons discussed above, this Court DENIES Defendants' Motion to Dismiss [24-1].


**ENTER:**


**DATE:** September 21, 2005          _Blanche M. Manning_
                                      **Blanche M. Manning**
                                      **United States District Judge**